NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2019 VT 1

No. 2017-284

| | |
|---|---|
| Gregory W. Zullo | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Rutland Unit, |
| | Civil Division |
| | |
| State of Vermont | May Term, 2018 |

Helen M. Toor, J.

Lia Ernst and James Diaz, ACLU Foundation of Vermont, Montpelier, for Plaintiff-Appellant.

Thomas J. Donovan, Jr., Attorney General, and Eve Jacobs-Carnahan and David R. Groff, Assistant Attorneys General, Montpelier, for Defendant-Appellee.

Matthew Valerio, Defender General, and Rebecca Turner, Appellate Defender, Montpelier, for Amicus Curiae Office of the Defender General.

Jeffrey T. Dickson of Dickson Law Office, PLLC, Burlington, Lindsay A. Lewis, New York, New York, and Dahlia Mignouna and Chad I. Golder of Munger, Tolles & Olson LLP, Washington D.C., for Amici Curiae National Association of Criminal Defense Lawyers, et al.

David Tartter, Deputy State's Attorney, Montpelier, for Amicus Curiae Department of State's Attorneys and Sheriffs.

PRESENT:  Reiber, C.J., Skoglund, Robinson, Eaton and Carroll, JJ.


¶ 1.     **EATON, J.**  In this civil rights action against the State of Vermont, plaintiff seeks declaratory relief and money damages for alleged violations of Article 11 of the Vermont Constitution arising from the stop, seizure, and search of his vehicle.  The civil division of the superior court granted summary judgment to the State, concluding that although damages may be

obtained in an implied private right of action directly under Article 11, in this case neither the stop, the exit order, nor the seizure and search of plaintiff's vehicle violated Article 11's constraints against governmental searches and seizures.

¶ 2.     At issue in this appeal is: (1) whether Article 11 provides a self-executing right of action for damages; (2) whether the Vermont Tort Claims Act (VTCA) governs any such action and, if not, whether the common law doctrine of sovereign immunity shields the State from liability; (3) if the action is neither governed by the VTCA nor barred by sovereign immunity, whether this Court should impose any limitations on obtaining damages against the State; and (4) assuming a damage remedy exists and plaintiff can potentially overcome any other barriers to obtaining damages against the State, whether the stop, exit order, and/or seizure and search of plaintiff's vehicle violated plaintiff's rights under Article 11, thereby entitling him to seek such relief.

¶ 3.     We conclude that an implied private right of action for damages is available directly under Article 11, that the VTCA does not apply to plaintiff's suit alleging a constitutional tort, and that the common law doctrine of sovereign immunity does not bar such an action against the State, but that damages may be obtained only upon a showing that a law enforcement officer acting within the scope of the officer's duties either acted with bad faith or knew or should have known that those actions violated clearly established law. We further conclude that although the exit order would not have violated Article 11 had the initial stop been lawful, both the stop and the warrantless seizure of plaintiff's vehicle violated Article 11. In light of our resolution of the legal issues before us, we reverse the superior court's grant of summary judgment in favor of the State, as well as its dismissal of one of plaintiff's counts in an earlier decision, and we remand the matter for further proceedings consistent with this opinion. As explained below, the parties are not precluded from submitting renewed motions for summary judgment based on the law established in this opinion.

2

I. Facts and Procedural History

A. Facts

¶ 4. "Summary judgment is proper only where the material undisputed facts show that the moving party is entitled to judgment as a matter of law." Morisseau v. Hannaford Bros., 2016 VT 17, ¶ 12, 201 Vt. 313, 141 A.3d 745. Accordingly, "[t]he nonmoving party is entitled to all reasonable doubts and inferences" regarding those facts. Id. (quotation omitted). "In determining whether there is a genuine issue of material fact, we will accept as true the allegations made in opposition to the motion . . . so long as they are supported by affidavits or other evidentiary material." Id. (quotation omitted). With this standard in mind, we summarize the relevant facts as follows.[1]

¶ 5. On the afternoon of March 6, 2014, plaintiff, a twenty-one-year-old African-American[2] male, had just finished his work shift at his place of employment in the Town of

---

[1] The superior court briefly summarized the facts and stated that the material facts are undisputed. Given our resolution of the legal issues presented in this appeal, some of the facts that are disputed could conceivably impact any assessment of liability or any potential damage remedy.

[2] Plaintiff does not make an equal protection claim, but throughout this case he has intimated that the stop, seizure, and search of his vehicle were the result of implied racial bias and racial profiling. In one of the amicus curiae briefs aligned with plaintiff, we are asked to consider, in determining whether and under what circumstances to allow a direct private right of action under Article 11, numerous studies indicating that implicit racial bias is a real and significant problem, not only nationally, but also in Vermont. See S. Seguino & N. Brooks, Driving While Black and Brown in Vermont (January 9, 2017), https://www.uvm.edu/giee/pdfs/SeguinoBrooks_Police Race_2017.pdf [https://perma.cc/BEA6-6F7V]; S. Seguino & N. Brooks, Racial/Ethnic Disparities in Traffic Stops: Analysis of Vermont State Police Data, 2010-15 (June 2016), https://stephanieseguino.weebly.com/uploads/2/3/2/7/23270372/brooks_and_seguino_vsp_2010-15_final.pdf [https://perma.cc/Z6VW-D7T7]; Inst. on Race and Just., Northeastern Univ., Vermont State Police: An Examination of Traffic Stop Data, July 1, 2010—December 31, 2015 (May 24, 2016), http://vsp.vermont.gov/sites/vsp/files/documents/VSPPresentation 05242016.pdf [https://perma.cc/5UMM-BGJ6]; see also B. Obama, Commentary, The President's Role in Advancing Criminal Justice Reform, 130 Harv. L. Rev. 811, 820-21 ("A large body of research finds that, for similar offenses, members of the African American and Hispanic communities are more likely to be stopped, searched, arrested, convicted, and sentenced to harsher penalties."). As the amicus points out, the Vermont Legislature has recognized the existence of this problem and taken steps to address it. See 20 V.S.A. § 2366(e)(1) (requiring Vermont law enforcement agencies to collect roadside stop data, including driver's race, reason for stop, and outcome of

Killington and was driving alone in the Town of Wallingford to see a friend. Lewis Hatch, a state trooper, was on duty in a marked state police vehicle. Trooper Hatch was in his vehicle at a Wallingford gas station when plaintiff drove by. The trooper pulled out of the station and followed plaintiff through Wallingford. He activated his vehicle's emergency blue lights and stopped plaintiff shortly after three o'clock in the afternoon.

¶ 6. Because the microphone in Trooper Hatch's shirt was either not working or not turned on, his interactions with plaintiff outside the range of the recording system in the trooper's vehicle were not recorded. Following the stop, Trooper Hatch approached the passenger-side window of plaintiff's car and asked plaintiff to provide his driver's license and registration. Plaintiff did so and explained to the trooper that he was coming from his work; plaintiff declined, however, to answer the trooper's questions as to where he was going. The trooper stated in his warrant application that he smelled a faint odor of burnt marijuana as he approached plaintiff's car, but during his interaction with plaintiff he did not deploy the drug-detection dog he had in his vehicle. Trooper Hatch observed an air freshener affixed to the center air vent in plaintiff's car and a small bottle of Visine in the car's center console. In response to the trooper's questioning, plaintiff told the trooper that he had smoked marijuana three days prior to the stop.[3] Any initial suspicion Trooper Hatch had that plaintiff was driving while impaired was quickly dispelled during the trooper's questioning of plaintiff.

---

stop); 3 V.S.A. § 168(f)(1)g(2) (establishing panel to "review and provide recommendations to address systemic racial disparities in statewide systems of criminal and juvenile justice," and requiring, among other things, continual review of data collected pursuant to 20 V.S.A. § 2366(e)(1) and submission of recommendations for training law enforcement officers and others "to recognize and address implicit bias").

[3] The superior court noted that the parties disagreed as to whether plaintiff acknowledged smoking marijuana in the car in the past and that, according to Trooper Hatch, plaintiff equivocated as to how many days it had been since he smoked marijuana. We do not find that either of these disputes concern material facts.

4

¶ 7.    Trooper Hatch ordered plaintiff to exit his car, but did not ask plaintiff to perform any field sobriety exercises. At some point after ordering plaintiff out of his car, in response to plaintiff's inquiry, the trooper told plaintiff for the first time that he had stopped him because there was snow partially obscuring the registration sticker affixed to his car's license plate. Plaintiff consented to Trooper Hatch's request that he submit to a search of his person, which did not reveal any evidence of contraband or a crime. Trooper Hatch then read plaintiff a consent card, advising him that if he did not agree to have his car searched, the car would be towed to the state police barracks while the trooper applied for a search warrant. Plaintiff refused to consent to a search of his car. Approximately twenty minutes after the initial stop, Trooper Hatch radioed for a tow truck.

¶ 8.    Trooper Hatch declined to give plaintiff a ride to his home in Rutland, but he offered to drop plaintiff off at a nearby gas station or call someone to pick him up. Plaintiff declined these offers, and he wound up walking and hitchhiking to his home eight miles away. After arriving at the Rutland police barracks, Trooper Hatch applied for a search warrant, which was issued at approximately seven o'clock in the evening. At the barracks, a certified drug detection dog alerted twice on the trunk of plaintiff's vehicle. A search was completed at seven-thirty in the evening. The search turned up a metal grinder and a small pipe with residue later identified as marijuana, but no evidence of a criminal offense. Plaintiff's vehicle was not released to plaintiff until approximately ten o'clock in the evening after he paid the required $150 towing fee.

B. Procedural History

¶ 9.    In September 2014, plaintiff filed suit against the State, alleging four counts of violations of Article 11 of the Vermont Constitution: (1) an unlawful traffic stop without reasonable suspicion of any traffic violation; (2) an unlawful exit order without reasonable suspicion of danger or the commission of a crime; (3) an unlawful seizure of his car without probable cause; and (4) an unlawful search of his car without probable cause. He sought a

5

declaration that Trooper Hatch's actions were illegal, an award of damages for the violations of his rights, and an award of costs.

¶ 10. In November 2014, the State filed a motion to dismiss counts two, three, and four, but not count one. In March 2015, the superior court denied the State's motion as to counts two and three, but it granted the motion as to count four concerning the alleged unlawful search. The court concluded that the alleged facts with respect to counts two and three concerning the exit order and seizure of plaintiff's car were sufficient to overcome the State's motion to dismiss. See Samis v. Samis, 2011 VT 21, ¶ 9, 189 Vt. 434, 22 A.3d 444 ("A motion to dismiss should be granted only when it is beyond doubt that there exist no facts or circumstances that would entitle the nonmoving party to relief.").

¶ 11. As for count four, the court stated that the key question was the meaning of Vermont's then-recent law decriminalizing the possession of less than one ounce of marijuana, see 18 V.S.A. § 4230a(a), 2013 No. 194 (Adj. Sess.), § 13 (effective June 17, 2014), insofar as plaintiff alleged that the search warrant was issued even though Trooper Hatch failed to cite any evidence suggesting that plaintiff's car contained more than one ounce of marijuana. In dismissing this count, the court relied mainly on the Legislature's pronouncement that marijuana is still contraband subject to seizure and forfeiture unless lawfully used for medicinal purposes and that the decriminalization of less than one ounce of marijuana is "not intended to affect the search and seizure laws afforded to duly authorized law enforcement officers." Id. § 4230a(c)(2). Moreover, the court concluded that the warrant application was not defective merely because it referenced evidence of a criminal offense rather than evidence of contraband. Following its dismissal of count four, the court granted plaintiff's motion to add a fifth count alleging that the search of his car was unlawful because Trooper Hatch dishonestly stated in his warrant application that he expected to find evidence of a crime.

6

¶ 12.   After the parties completed discovery that included taking the depositions of plaintiff and Trooper Hatch, they filed cross-motions for summary judgment.  The State asserted that summary judgment should be entered on count one because the stop was lawful and because the trooper's actions were protected by qualified immunity.  With respect to counts two, three, and five, the State argued that the totality of the circumstances justified the exit order and the seizure and search of plaintiff's vehicle.  The State also argued that even if Trooper Hatch erred in assessing whether reasonable suspicion or probable cause existed to support the exit order and seizure of plaintiff's vehicle, either qualified immunity or sovereign immunity barred plaintiff's action.  Plaintiff responded that the State waived its sovereign immunity, either through the VTCA or Article 11 itself, and that Trooper's Hatch's qualified immunity did not extend to the State.  Plaintiff further argued that none of the statutes or caselaw relied upon by the State provided legal justification for Trooper Hatch to stop plaintiff, order him to exit his vehicle, or seize and search his vehicle.

¶ 13.   In May 2017, the superior court granted the State's motion for summary judgment and denied plaintiff's cross-motion for summary judgment.  The court concluded that: (1) the VTCA is inapplicable because it concerns only common law torts and because no private analogs exist for Trooper Hatch's actions; (2) Article 11 provides an implied private right of action for damages against the State; and (3) money damages are an appropriate remedy if liability is found because there is no viable alternative remedy.  The court granted the State's motion for summary judgment, however, based on its determination that Trooper Hatch's actions did not violate Article 11.  The court concluded that: (1) any mistake of law by Trooper Hatch in stopping plaintiff based on a partially obscured registration sticker was objectively reasonable and thus did not rise to an actionable violation of Article 11; (2) the faint smell of burnt marijuana, in combination with the presence of the air freshener and bottle of Visine, provided Trooper Hatch with reasonable suspicion to order plaintiff to exit his car; and (3) even though the air freshener and Visine lost

7

their probative value after Trooper Hatch's concerns about plaintiff's possible impaired driving were dispelled, the faint smell of burnt marijuana alone provided probable cause to seize plaintiff's car and obtain a warrant to search the car—notwithstanding the fact that possession of less than one ounce of marijuana was only a civil infraction at the time of the stop.

¶ 14.    Plaintiff appeals, arguing that: (1) in assessing whether the stop in this case violated Article 11, which offers more protection than the Fourth Amendment, this Court should not follow the U.S. Supreme Court's recent holding that reasonable suspicion to support a traffic or investigatory stop may rest upon a police officer's reasonable mistake of law, see Heien v. N. Carolina, ___ U.S. ___, 135 S. Ct. 530 (2014); (2) even if this Court were to adopt a Heien-type analysis, the stop in this instance violated Article 11 because it was not objectively reasonable for Trooper Hatch to believe that plaintiff had violated a statute requiring number plates to be kept unobscured with legible letters and numbers; (3) Trooper Hatch ordered plaintiff to exit his car without reasonable suspicion of criminal activity or any other legal justification, in violation of Article 11; and (4) there was no probable cause to seize or search plaintiff's car.[4]  The Office of the Defender General raises similar arguments in its amicus curiae brief filed in support of plaintiff's appeal.  In another amicus curiae brief filed in support of plaintiff's appeal, the National Association of Criminal Defense Lawyers (NACDL) and other organizations[5] argue that adopting the holding in Heien would undercut the protections guaranteed by Article 11, as evidenced by studies indicating that, as the result of implicit racial bias, law enforcement officers are more likely to mistake the actions of nonwhite individuals as violations of the law.

---

[4]  Plaintiff does not challenge on appeal the superior court's rejection of his claim that Trooper Hatch misrepresented material facts in his application for a search warrant.

[5]  The other organizations are Migrant Justice, Vermonters for Criminal Justice Reform, The Root Social Justice Center, The Peace and Justice Center, local chapters of The National Association for the Advancement of Colored People, and Justice for All.

The State responds that: (1) the superior court was correct in holding that the VTCA does not grant jurisdiction for plaintiff's claims; (2) Article 11 does not provide jurisdiction for a private right of action against the State because the State is protected by its sovereign immunity and because alternative remedies exist;[6] (3) Trooper Hatch's stop of plaintiff's car did not violate Article 11 because it was objectively reasonable for him to believe that plaintiff was in violation of a motor vehicle law; and (4) notwithstanding the then-existing marijuana decriminalization law, reasonable suspicion supported the exit order and probable cause supported the seizure and search of plaintiff's car. In its amicus curiae brief, the Department of State's Attorneys and Sheriffs argues that this Court should follow Heien and hold that traffic stops based on an officer's objectively reasonable mistake of law satisfy the reasonable suspicion standard and thus do not violate Article 11.

## II.  The Vermont Tort Claims Act and Sovereign Immunity

¶ 15.   We first address the State's argument that no private right of action may be implied directly under Article 11 because the State has not waived its sovereign immunity to any such action either under the VTCA or any other legislation. According to the State, Vermont courts lack jurisdiction over plaintiff's lawsuit, notwithstanding his claims of constitutional violations, because plaintiff has failed to identify a statutory waiver of sovereign immunity, which the State

---

[6]  Because the State was content with the superior court's summary judgment ruling in its favor, it was not required to file a cross-appeal challenging the court's conclusion that Article 11 provides an implied private right of action seeking money damages for alleged unlawful searches and seizures. See Huddleston v. Univ. of Vt., 168 Vt. 249, 255, 719 A.2d 415, 419 (1998) ("An appellee seeking to challenge aspects of a trial court's decision must file a timely cross-appeal unless, of course, the party was content with the final order below, leaving it nothing to appeal." (citation omitted)); Staruski v. Cont'l Tel. Co. of Vt., 154 Vt. 568, 571 n.3, 581 A.2d 266, 267 n.3 (1990) (noting that appellee was not required to file cross-appeal to preserve its claims on appeal "since it was content with the final order in the case, namely the JNOV in its favor, and therefore had nothing in the first instance to appeal"); cf. Stowell v. Action Moving & Storage, Inc., 2007 VT 46, ¶ 7 n.3, 182 Vt. 98, 933 A.2d 1128 (addressing issue on which appellant prevailed at trial and that appellee was challenging on appeal, despite no cross-appeal, because if appellee prevailed on issue "we would reach the same result as the superior court with respect to [appellant's] appeal issues, but on a different ground").

contends is necessary before he can sue the State for damages.[7] The State concurs with the superior court's assessment that plaintiff's constitutional tort claim does not fit within the VTCA's waiver provisions, arguing that the Act applies only to ordinary common law torts and that there are no private analogs for Trooper Hatch's actions within the scope of his duties. The State argues, however, that, absent any other legislation explicitly waiving sovereign immunity for constitutional torts, plaintiff's suit against the State is barred for lack of jurisdiction.

¶ 16. Plaintiff responds that an explicit legislative waiver of sovereign immunity is not required to obtain a damages remedy under a self-executing constitutional provision for a violation of one's constitutional rights under that provision. Plaintiff agrees with the State and the superior court that his constitutional tort claim should not proceed through the VTCA because the Act does not apply to constitutional claims. He also argues, however, that even if the Act applied to his constitutional claims, it would not bar those claims because common law torts such as unlawful trespass and false imprisonment provide private analogs for his claims and because the discretionary function exception in the Act does not apply to unconstitutional or unlawful conduct.

A. The Vermont Tort Claims Act

¶ 17. As noted, the superior court agreed with the State that the VTCA does not govern plaintiff's lawsuit for two interrelated reasons: the Act applies only to ordinary common law torts and only where there is a private analog—in other words, where the cause of action is comparable

---

[7] The State did not make this specific argument below; rather, it argued only that the State was immune from suit because it had not waived its immunity in the VTCA. In so arguing, the State noted that this Court had not explicitly addressed the issue of whether the State is entitled to rely on sovereign immunity in defending claims brought under the Vermont Constitution. The superior court determined that Article 11 provided a private right of action for damages arising from violations by the State or its agents and that the VTCA did not apply, but it did not otherwise address the question of sovereign immunity, thereby intimating that Article 11, of its own force, impliedly waived the State's sovereign immunity. We address the State's argument on appeal because it is the primary question with respect to whether plaintiff may go forward with his lawsuit. See My Sister's Place v. City of Burlington, 139 Vt. 602, 608, 433 A.2d 275, 279 (1981) (stating that "sovereign immunity is not considered an affirmative defense in Vermont").

to one available against a private citizen. The court rejected plaintiff's arguments that his lawsuit was analogous to actions against private individuals for trespass to chattel, false imprisonment, and invasion of privacy. The court concluded that because the ultimate question—whether Trooper Hatch acted in conformance with plaintiff's constitutional rights—turned on purely governmental functions, his lawsuit could not be treated as analogous to a common law claim against a private party.

¶ 18. "[T]he primary purpose of the VTCA is to waive sovereign immunity for recognized causes of action, particularly for common law torts." See Kennery v. State, 2011 VT 121, ¶ 26, 191 Vt. 44, 38 A.3d 35. First enacted in 1961, the VTCA generally makes the State liable for injuries, with delineated exceptions, resulting from the negligent or wrongful acts or omissions of state employees acting within the scope of their employment "under the same circumstances, in the same manner, and to the same extent as a private person would be liable." 12 V.S.A. § 5601. The statute does not explicitly address constitutional torts. Cf. J. Friesen, State Constitutional Law: Litigating Rights, Claims, and Defenses § 8.04[4], at 24 (4th ed. 2006) (citing state statutes explicitly recognizing compensation for deprivation of constitutional rights); G. Gildin, Redressing Deprivations of Rights Secured by State Constitutions Outside the Shadow of the Supreme Court's Constitutional Remedies Jurisprudence, 115 Penn St. L. Rev. 877, 883-85 (2011) (citing state legislatures that have enacted statutory civil damages action for invasion of state constitutional rights, and noting that some statutes encompass all state constitutional rights while others create causes of action only for specifically enumerated rights or for situations in which public official acts with heightened level of culpability).

¶ 19. The VTCA's private-analog waiver, which is similar to that contained in the Federal Tort Claims Act (FTCA),[8] "is primarily directed at the 'ordinary common-law torts.' "

---

[8] One notable difference is that the FTCA provides that the government is liable "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C.

Denis Bail Bonds, Inc. v. State, 159 Vt. 481, 485, 622 A.2d 495, 498 (1993). "By maintaining a link to private causes of action, this approach serves to prevent the government's waiver of sovereign immunity from encompassing purely 'governmental' functions." Id. at 485-86, 622 A.2d at 498. Nevertheless, "[t]he purpose of the private-analog provision is not to bar, without exception, suits claiming injuries based on the breach of duties performed by government employees performing government services, but rather to place constraints on how creative courts can be in finding duties where none had previously existed." Sabia v. State, 164 Vt. 293, 302, 669 A.2d 1187, 1193 (1995). Under the private-analog waiver, the State may be liable if the plaintiff's cause of action is comparable to an action maintainable against a private citizen such that the allegations satisfy the necessary elements of the comparable action. Denis Bail Bonds, 159 Vt. at 486, 622 A.2d at 498.[9]

¶ 20. Although plaintiff cites false imprisonment and trespass to chattels as private-analog torts, he does not demonstrate that his "factual allegations satisfy the necessary elements of a recognized cause of action." Kane v. Lamothe, 2007 VT 91, ¶ 7, 182 Vt. 241, 936 A.2d 1303; cf. Bivens v. Six Unknown Named Agents, 403 U.S. 388, 392 (1971) (rejecting "the notion that the Fourth Amendment proscribes only such conduct as would, if engaged in by private persons, be condemned by state law"). Nor does he effectively counter the superior court's point, with which we agree, that the ultimate question of whether Trooper Hatch acted in compliance with

---

§ 2674 (emphasis added), while the VTCA makes the State liable "under the same circumstances, in the same manner, and to the same extent as a private person would be liable," 12 V.S.A. § 5601(a) (emphasis added). The U.S. Supreme Court has explicitly drawn a distinction between the two highlighted words, stating that "the words 'like circumstances' do not restrict a court's inquiry to the same circumstances, but require it to look further afield." United States v. Olson, 546 U.S. 43, 46 (2005) (quotation omitted).

[9] We have pointed out that a situation involving a private analog is distinct from one in which a state employee commits a common law tort "for which the source of their employment is unconnected to the duty of care"—for example, a traffic accident on the way to a meeting. Kennery, 2011 VT 121, ¶ 27. Both situations are actionable under the VTCA.

12

plaintiff's constitutional rights turns on law enforcement responsibilities that have no private analog. See Dorwart v. Caraway, 2002 MT 240, ¶ 44, 58 P.3d 128 (agreeing with "authorities that there is a great distinction between wrongs committed by one private individual against another and wrongs committed under authority of the state").

¶ 21. Indeed, the limited federal case law under the FTCA suggests that no private analog exists here. Cf. Casillas v. United States, No. CV 07-395-TUC-DCB (HCE), 2009 WL 735193, at *11 (D. Ariz. Feb.11, 2009) ("It follows that just as there is no private analog to the act of applying for a search warrant, there is also no private analog to the investigation leading to the decision to seek the warrant."). Given the VTCA's silence as to constitutional torts and the absence of any comparable private analog, we conclude that the Act's statutory waiver of sovereign immunity against certain civil tort claims does not apply here.

B. Sovereign Immunity

¶ 22. Having determined that the VTCA does not govern plaintiff's lawsuit, we consider the State's argument that Vermont courts lack jurisdiction over constitutional tort claims absent an express statutory waiver of sovereign immunity. Whether the common law doctrine of sovereign immunity stands as a bar to constitutional torts absent an explicit legislative waiver is a difficult question with which few courts have grappled. See Shields v. Gerhart, 155 Vt. 141, 152, 582 A.2d 153, 160 (1990) ("[T]he question of whether sovereign immunity should be a defense to [constitutionally based tort claims for damages] is itself complex."); J. Friesen, supra, § 8.02[2], at 9 ("Where constitutionally based damage suits are allowed, the sparse caselaw is divided on whether they are completely subject to the state rules that affect other claims against governmental bodies and their employees, or are exempt from some of them.").

¶ 23. Although it has a long history, the ancient English common law doctrine that "the King can do no wrong" is not inviolate. See Levinsky v. Diamond, 151 Vt. 178, 183, 559 A.2d 1073, 1077 (1989) (noting that sovereign immunity is "derived from the concept that 'the King

13

can do no wrong' "), overruled on other grounds by Muzzy v. State, 155 Vt. 279, 281, 583 A.2d 82, 83 (1990); J. Friesen, supra, § 8.03[2], at 12 ("Over the last thirty or forty years, the doctrine of sovereign immunity has come under attack in the state courts, where in state after state which had maintained sovereign immunity or municipal immunity as a matter of common law, the doctrines have been judicially abolished or limited.").[10]  Indeed, this Court long ago recognized that due process violations are an exception to the general principle applying sovereign immunity absent an explicit legislative waiver.  See Denis Bail Bonds, 159 Vt. at 484-85, 622 A.2d at 497 ("Absent due process violations, lawsuits against the state for acts essentially governmental in nature are barred unless the state waives its sovereign immunity and consents to be sued." (emphasis added)); Williams v. State, 156 Vt. 42, 55-56, 589 A.2d 840, 848-49 (1990) (acknowledging that "due process may require that states entertain suits against them though they have not consented," but cautioning that common law sovereign immunity "is not vitiated entirely" as long as state "comports with due process principles").

¶ 24.    On multiple occasions, this Court has declined to address whether the doctrine of sovereign immunity bars constitutional torts against the State absent an explicit legislative waiver. See Stevens v. Stearns, 2003 VT 74, ¶¶ 8-9, 175 Vt. 428, 833 A.2d 835 (declining to address plaintiffs' inadequately briefed claim that state was not entitled to sovereign immunity from their suit seeking damages for state employees' violation of their Article 11 rights); Shields v. Gerhart,

---

[10]    Almost forty years ago, in a case where the plaintiff made "no specific claims of unconstitutionality," this Court acknowledged "that many jurisdictions have abolished, and legal commentators have advocated abolition of, the doctrine of sovereign immunity where created by judicial decision." Lomberg v. Crowley, 138 Vt. 420, 424, 415 A.2d 1324, 1327 (1980).  The State relies upon the Court's pronouncement in Lomberg that "[w]hile not all legislative enactments concerning a doctrine which may have had a judicial origin will preclude its judicial abolition, there are instances in which [a] doctrine has such clear legislative recognition, as is the case at bar, 29 V.S.A. § 1403 [general waiver of sovereign immunity to extent of insurance coverage], that we are bound to acknowledge its continuance until the legislature mandates otherwise." Id. Nothing in this statement precludes this Court from holding that the common law doctrine of sovereign immunity does not stand as an absolute bar to tort suits seeking damages for alleged constitutional violations.

163 Vt. 219, 237, 658 A.2d 924, 936 (1995) ("Because of our disposition of the merits of plaintiff's complaint [seeking damages under Articles 1 and 13 of the Vermont Constitution], we do not need to decide whether plaintiff's claims are also barred by the state's sovereign immunity."). Although we did not address in Shields whether the common law doctrine of sovereign immunity was an absolute bar to damage claims against the State based on alleged constitutional violations, we emphasized "the preeminence of the Vermont Constitution in our governmental scheme." Shields, 163 Vt. at 223, 658 A.2d at 927. Noting the truism that a constitution is "the expression of the will of the people" and thus "stands above legislative or judge-made law," we stated that "the absence of legislative enabling statutes cannot be construed to nullify rights provided by the constitution if those rights are sufficiently specified." Id.

¶ 25.    In a more recent case in which we upheld the liability of a municipality sued for damages directly under the Common Benefits Clause of the Vermont Constitution, we reiterated the preeminence of the Vermont Constitution over legislative and judge-made law. See In re Town Highway No. 20, 2012 VT 17, ¶ 26, 191 Vt. 231, 45 A.3d 54 (stating that Vermont Constitution, which "is preeminent in our governmental scheme" as "the fundamental charter of our state" and expression of people's will, "confers upon the government limited powers while simultaneously protecting the basic freedoms of the governed"). Although the municipality in that case "invoke[d] the doctrine of municipal immunity to completely absolve itself from liability, we discern[ed] no logic or policy purpose in recognizing a constitutional tort derived from our fundamental charter of rights while simultaneously granting the Town immunity because it was performing a 'governmental' function." Id. ¶ 58. In support of this statement, we quoted the North Carolina Supreme Court, which provided the following explanation for why it was rejecting the notion that the common law doctrine of sovereign immunity barred damage claims brought directly under the state constitution:

> It would indeed be a fanciful gesture to say on the one hand that citizens have constitutional individual civil rights that are protected from encroachment actions by the State, while on the other hand saying that individuals whose constitutional rights have been violated by the State cannot sue because of the doctrine of sovereign immunity.

Corum v. Univ. of N.C., 413 S.E.2d 276, 291 (N.C. 1992); see Shields, 163 Vt. at 223, 658 A.2d at 928 ("To deprive individuals of a means by which to vindicate their constitutional rights would negate the will of the people ratifying the constitution, and neither this Court nor the Legislature has the power to do so.").

¶ 26. The few state courts that have addressed this issue are divided over whether sovereign immunity serves as an absolute bar to constitutional torts absent an explicit legislative waiver. See T. Hunter Jefferson, Constitutional Wrongs and Common Law Principles: The Case for the Recognition of State Constitutional Tort Actions Against State Governments, 50 Vand. L. Rev. 1525, 1541-43 (1997) (citing state courts that have accepted or rejected doctrine of sovereign immunity as bar to constitutional torts, either based on tort claims act or incompatibility of doctrine with constitutional violations). Compare Corum, 413 S.E.2d at 291-92 (stating that common law theory of sovereign immunity must yield to constitutional rights and thus "cannot stand as a barrier to North Carolina citizens who seek to remedy violations of their [constitutional] rights") with Figueroa v. State, 604 P.2d 1198, 1206 (Haw. 1979) ("[I]n a suit against the state, there cannot be a right to money damages without a waiver of sovereign immunity and we regard as unsound the argument that all substantive rights of necessity create a waiver of sovereign immunity such that money damages are available."), and McKenna v. Julian, 763 N.W.2d 384, 390 (Neb. 2009) (stating that "existence of a self-executing constitutional right does not entail waiver of the state's sovereign immunity from suit based upon such a right" and reasoning that self-executing constitutional provision, absent language implicating sovereign immunity, "merely creates a right that does not need further legislative action in order to become operable against nonsovereigns").

16

¶ 27. The Vermont Constitution neither declares the State immune from all damages stemming from violations of its provisions nor specifies that the State retains any immunity not expressly waived by the State. Accordingly, in light of the reasoning in our prior caselaw discussed above, we conclude that the common law doctrine of sovereign immunity is not an absolute jurisdictional bar to Vermont courts considering constitutional tort actions.

¶ 28. Our conclusion that the common law doctrine of sovereign immunity cannot jurisdictionally bar suits alleging constitutional torts does not mean that the Legislature lacks authority to limit or confine such suits in any way. See Bosh v. Cherokee Cty. Bldg. Auth., 2013 OK 9, ¶¶ 14, 23, 305 P.3d 994 (noting that court had previously abrogated sovereign immunity while acknowledging legislature's right to enact statutory immunity, but holding that subsequent tort claims act "cannot be construed as immunizing the state completely from all liability for violations of the constitutional rights of its citizens"); see also Deal v. Brooks, 2016 OK CIV APP 81, ¶ 4, 389 P.3d 375 (holding that tort claims act "does not immunize [human services department] from liability for reckless and deliberate acts that deprive a child of her due process rights while in state custody" (emphasis omitted)). As we discuss below, the Vermont Constitution requires a meaningful remedy for constitutionally grounded tort violations. Although this Court is the ultimate arbiter of what constitutes a meaningful remedy, the Legislature may provide and limit a statutory remedy for constitutionally based tort violations, as long as the remedy provides meaningful redress for significant violations.

¶ 29. Absent legislation providing a meaningful remedy for constitutional tort violations, in determining the scope and limits of sovereign immunity, we conclude that the judge-made doctrine does not supersede the right of the people to seek redress from the State for violations of fundamental constitutional rights. Invoking absolute sovereign immunity to prevent a remedy for significant breaches of constitutional rights would undermine the fundamental protections provided by our state constitution, which exists "to dictate certain boundaries to the government."

17

J. Friesen, supra, § 8.08[1], at 51 (citing "strong policy argument" that invoking sovereign immunity for breaches of bill of rights aimed at curtailing government power "would make a mockery of constitutional democracy"). The theory that one cannot assert a wrong against the government that created the law upon which the asserted rights depend has no force with respect to constitutional rights, which "are created by the citizenry to govern the government." Id. at 52.

¶ 30. We recognize that plaintiff's action against the State in this case is based on vicarious rather than direct liability. We note that this is consistent with the legislative policy set forth in the VTCA. See 12 V.S.A. § 5602(a) (providing that exclusive right of action is against State for state employees' acts or omissions within scope of employment that cause injury)[11]; see also 3 V.S.A. § 1101(a) (providing in relevant part that in civil action against state employees alleging damage or deprivation of rights arising from performance of employees' official duties, State is obligated to defend action and provide legal representation on behalf of employees). More significantly, "the State is appropriately held answerable for the acts of its officers and employees because it can avoid such misconduct by adequate training and supervision and avoid its repetition by discharging or disciplining negligent or incompetent employees." Brown v. State, 674 N.E.2d 1129, 1142-43 (N.Y. 1996); see Bosh, 2013 OK 9, ¶ 32 (noting that problems of federalism which preclude applying common law doctrine of respondeat superior in § 1983 actions are not present in actions for violation of state's constitution); see also C. Pillard, Taking Fiction Seriously: The Strange Results of Public Officials' Individual Liability Under Bivens, 88 Geo. L.J. 65, 66, 103-04 (1999) (arguing that individual liability theory in Bivens was fiction intended to evade sovereign immunity issues); J. Madden, Bedtime for Bivens: Substituting the United States as Defendant in Constitutional Tort Suits, 20 Harv. J. on Legis. 469, 473-74 (1983) (noting problems

---

[11] We recognize that the VTCA does not indemnify state employees for gross negligence or willful misconduct, 12 V.S.A. § 5606(c)(1), but as explained above, the Act does not govern constitutional tort claims.

with constitutional tort cases against individual officers, including lack of financially responsible defendants, and arguing that government should be responsible for wrongful conduct of its agents).

¶ 31. In short, the common law doctrine of sovereign immunity does not act as a jurisdictional bar to plaintiff's civil damage suit against the State alleging that a state officer deprived him of the protection from government interference guaranteed by Article 11 of the Vermont Constitution.

### III. Implied Private Right of Action Directly Under Article 11

¶ 32. Having determined that the VTCA is inapplicable and that the common law doctrine of sovereign immunity is not a jurisdictional bar to plaintiff's lawsuit, we turn to the question of whether plaintiff may seek damages in an implied action directly under Article 11. This is an issue of first impression for this Court. See Stevens, 2003 VT 74, ¶¶ 18, 20. We have established a two-step inquiry to determine whether monetary damages are available directly under a particular constitutional provision. We must first consider whether the constitutional provision at issue is self-executing in the sense that it is specific enough to support an action against the state or state officials absent implementing legislation. Shields, 163 Vt. at 222, 658 A.2d at 927. If that hurdle is cleared, we must then "determine whether monetary damages are available as a remedy for a violation" because of the absence of any viable alternative remedy. Id.

### A. Self-Executing

¶ 33. As we explained in Shields, a constitutional provision is self-executing if it provides sufficient direction by which the right at issue might be protected; whereas it is not self-executing if it merely states a general principle without establishing any basis on which that principle may be enforced. Id. at 224, 658 A.2d at 928. Thus, "a self-executing provision should do more than express only general principles; it may describe the right in detail, including the means for its enjoyment and protection." Id. "Ordinarily a self-executing provision does not contain a directive to the legislature for further action." Id.

19

¶ 34. Under this test, there is little doubt that Article 11 is self-executing. Indeed, search-and-seizure provisions such as Article 11 are the paradigmatic self-executing provisions. Article 11's federal counterpart, the Fourth Amendment, is the constitutional provision in which the U.S. Supreme Court first recognized a direct constitutional damage remedy. See Bivens, 403 U.S. at 397. Search-and-seizure provisions have also been the basis of direct constitutional damage actions accepted in other jurisdictions. See, e.g., Binette v. Sabo, 710 A.2d 688, 789 (Conn. 1998) (concluding that search-and-seizure and arrest provisions of Connecticut Constitution afford private cause of action for money damages); Moresi v. Dep't of Wildlife & Fisheries, 567 So. 2d 1081, 1092-93 (La. 1990) (concluding that "damages may be obtained by an individual for injuries or loss" resulting from violation of search-and-seizure provision of Louisiana Constitution); Dorwart, 2002 MT 240, ¶ 44 (applying test set forth in Shields and concluding that Montana Constitution's search-and-seizure provision, among others, is self-executing and may be basis of direct action for money damages); Brown, 674 N.E.2d at 1137-39 (concluding that state constitutional search-and-seizure clause is manifestly self-executing and that direct cause of action to recover damages may be asserted against state for violation of clause); see also Godfrey v. State, 898 N.W.2d 844, 858-60 (Iowa 2017) (providing overview of state supreme court cases finding state constitutional provisions self-executing for purposes of obtaining money damages).

¶ 35. Insofar as Article 11 unequivocally sets forth a single specific right of the people to be free from unwarranted searches and seizures of their persons, possessions, and property, that provision is manifestly self-executing. Cf. Shields, 163 Vt. at 226-27, 658 A.2d at 929-30 (stating that Article 13 unequivocally sets forth single specific right rather than general principle). Our extensive case law on Article 11 demonstrates that the right set forth therein is certain and definite enough to establish rules for the implementation of that right. Cf. Town Highway, 2012 VT 17, ¶ 32 (stating that Common Benefits Clause is certain and definite enough to allow formation of rules for judicial decision). Moreover, because the right set forth in Article 11 is sufficiently

20

specified, "the absence of a legislative directive supports a conclusion that the provision is self-executing." Shields, 163 Vt. at 227, 658 A.2d at 930.

## B. Alternative Remedies

¶ 36.    Our conclusion that Article 11 is self-executing means that the right set forth therein does not "need further legislative action to become operative"; however, "[i]t does not necessarily mean that monetary damages are the proper remedy for a violation." Id. at 227-28, 658 A.2d at 930.  The second part of our inquiry is to determine "if monetary damages are an appropriate remedy for the constitutional violation." Town Highway, 2012 VT 17, ¶ 35.  "Determining whether a constitutional tort merits monetary relief . . . necessarily compels a careful inquiry into the precise nature of the injury alleged and the adequacy of existing remedies to redress it." Id. ¶ 36.  A constitutional damage remedy is most appropriate when "damages must be recognized to give a plaintiff some remedy." Shields, 163 Vt. at 233, 658 A.2d at 933.  "[T]he law supports civil damages when an alternative remedy does not meaningfully compensate the injury." Town Highway, 2012 VT 17, ¶ 50.  Ultimately, the question is whether "compensatory relief is necessary or appropriate to the vindication of the interest asserted." Id. ¶ 35 (quotations omitted). "Historically, damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." Bivens, 403 U.S. at 395.

¶ 37.    The standard remedy for an Article 11 violation in a criminal context—the exclusionary rule—provides no relief to the instant plaintiff, who was not charged with a crime. The State argues, however, that each of the following remedies is a sufficient alternative to suing the State for damages: (1) an action against Trooper Hatch pursuant to 42 U.S.C. § 1983; (2) injunctive relief prohibiting the State from stopping vehicles with covered registration stickers[12] or from issuing exit orders based on suspicion that the driver possessed less than one

---

[12]    As discussed below, the relevant statute has since been amended to require that registration stickers be kept unobscured.

ounce of marijuana; (3) administrative relief by way of Vermont Rule of Criminal Procedure 41 or 18 V.S.A. §§ 4241-4248, which provide procedures for reclaiming seized or forfeited property; (4) an administrative complaint against the individual officer accused of improper conduct; and (5) the assertion of rights in a criminal proceeding, including filing a motion to suppress, had plaintiff been criminally charged as result of the incident in question.

¶ 38.    We conclude that none of the State's proffered alternative remedies would provide meaningful redress to plaintiff for the constitutional transgressions he alleges.  Generally, 42 U.S.C. § 1983 "creates a remedy for violations of federal rights committed by persons acting under color of state law."  Howlett v. Rose, 496 U.S. 356, 358 (1990).  A § 1983 action for monetary damages cannot be maintained against a state, a state agency, or state officials sued in their official capacity.  Id. at 365.  One may obtain injunctive relief against state officials in their official capacity under § 1983, Will v. Mich. Dep't of State Police, 491 U.S. 58, 71 n.10 (1989), but monetary damages are available against state officials only in their individual capacity, Kentucky v. Graham, 473 U.S. 159, 165 (1985).

¶ 39.    Notwithstanding these impediments, some courts have found § 1983 to be a viable alternative remedy to a direct private right of action for damages under certain provisions of their state constitutions.  See State v. Heisey, 271 P.3d 1082, 1096-97 (Alaska 2012) (concluding that § 1983 is viable alternative remedy because "an alternative remedy need not be an exact match" and protections against excessive force in state and federal constitutions "are substantially the same"); Jones v. City of Phila., 890 A.2d 1188, 1212-13 (Pa. Commw. Ct. 2006) (stating that § 1983 is viable alternative remedy because state constitutional protection against use of excessive force is no broader than federal constitutional protection).  However, apart from the fact that § 1983 actions seeking damages may be brought only against government officials in their individual capacity, this Court has construed Article 11 to provide broader protections than the Fourth Amendment in several contexts, including the context at issue here.  See State v. Cunningham,

22

2008 VT 43, ¶ 16, 183 Vt. 401, 954 A.2d 1290 (noting that this Court has "consistently held that Article 11 provides greater protections than its federal analog, the Fourth Amendment"); State v. Bauder, 2007 VT 16, ¶ 10, 181 Vt. 392, 924 A.2d 38 (recognizing that both Article 11 and Fourth Amendment protect against unreasonable government intrusions into legitimate expectations of privacy, but noting that "we have also long held that our traditional Vermont values of privacy and individual freedom—embodied in Article 11—may require greater protection than that afforded by the federal Constitution"); see, e.g., State v. Sprague, 2003 VT 20, ¶¶ 16-20, 175 Vt. 123, 824 A.2d 539 (declining to follow under Article 11 U.S. Supreme Court's holding in Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977), that police may order driver to exit vehicle whenever vehicle has been lawfully stopped); State v. Oakes, 157 Vt. 171, 183-84, 598 A.2d 119, 126-27 (1991) (declining to follow good-faith exception to exclusionary rule adopted in United States v. Leon, 468 U.S. 897 (1984)).  In this case, plaintiff seeks redress under Article 11 for some conduct—for example, the exit order—that could not have been actionable under the Fourth Amendment.  See Sprague, 2003 VT 20, ¶¶ 16-20.

¶ 40.    This Court has followed other courts in inferring a private right of action under various state constitutional provisions because "[w]hile certain wrongs may find redress under federal law, we recognize the inherent and independent value in the rights and protections enshrined in our own constitution."  Town Highway, 2012 VT 17, ¶ 27.  As we stated in Town Highway, "the federal statutory remedy under 42 U.S.C. § 1983 generally 'creates no impediment to judicial recognition of a damages remedy' under the state constitution, as the civil rights statute is limited to violations of federal law, and the state constitution may protect broader interests than those under the federal constitution."  Id. ¶ 54 n.6 (quoting Binette, 710 A.2d at 698 n.18); see Widgeon v. E. Shore Hosp. Ctr., 479 A.2d 921, 929 (Md. 1984) (holding that existence of remedy under § 1983 "is not a persuasive basis" to defeat claim based on state constitution).  Accordingly, we do not find § 1983 to be an adequate alternative remedy in this case.

¶ 41. The State's reliance on injunctive relief as an alternative remedy is equally unavailing. As the U.S. Supreme Court noted in Bivens, "damages have been regarded as the ordinary remedy for an invasion of personal interests in liberty." 403 U.S. at 395. Indeed, the ineffectiveness of injunctive relief as a remedy for a past invasion of an individual's liberty interest resulting from an unlawful search and seizure was what prompted the Supreme Court to imply a constitutional damage remedy in Bivens. See id. at 409-10 (Harlan, J., concurring) ("[I]t is apparent that some form of damages is the only possible remedy for someone in Bivens' alleged position. It will be a rare case indeed in which an individual in Bivens' position will be able to obviate the harm by securing injunctive relief from any court."); Brown, 674 N.E.2d at 1141 (stating that injunctive relief was not viable alternative remedy for alleged unconstitutional seizures because plaintiffs "had no opportunity to obtain injunctive relief before the incidents described and no ground to support an order enjoining future wrongs"); see also Town Highway, 2012 VT 17, ¶ 86 (Dooley, J., concurring and dissenting) (stating that "deprivation of the constitutional right to be protected against unreasonable searches could not be undone or remedied through any . . . means" other than "a monetary award").

¶ 42. Moreover, we find no merit to the State's argument that a viable alternative remedy exists here in the potential to reclaim property under Vermont Rule of Criminal Procedure 41 or to seek return of forfeited property under 18 V.S.A. §§ 4241-4248. There is no indication that plaintiff made any claim for seized or forfeited property, which would be the case in many, if not most, instances involving an unlawful search and seizure. In this case, the extent of plaintiff's property loss would have been, at most, a metal grinder and a pipe containing marijuana residue. Return of such property would hardly provide a meaningful remedy for the alleged violation of his constitutional rights.

¶ 43. Nor do we find merit in the State's suggestion that an administrative complaint would be a viable alternative. If that were the case, no damages claim would ever lie against a

public official. Even if a confidential internal affairs investigation resulted in some disciplinary action against a law enforcement officer, 20 V.S.A. § 1923(d) (providing that records of internal investigation shall be confidential with specific exceptions), it would offer no remedy to individuals deprived of their constitutional rights, other than the knowledge that the offending officer may or may not have been disciplined, which may or may not result in others being spared a similar deprivation of their rights.

¶ 44. The simple answer to the State's argument that plaintiff could have filed a motion to suppress had he been charged with a crime is that he was not—and apparently could not successfully have been—charged with a crime. "The interest protected by Article 11, like the Fourth Amendment, is the expectation of the ordinary citizen, who has never engaged in illegal conduct . . . ." State v. Bryant, 2008 VT 39, ¶ 39, 183 Vt. 355, 950 A.2d 467 (quotation omitted) ("We protect defendant's marijuana plots against [warrantless aerial] surveillance so that law-abiding citizens may relax in their backyards, enjoying a sense of security that they are free from unreasonable surveillance."); see United States v. White, 401 U.S. 745, 788 n.24 (1971) (Harlan, J., dissenting) (reasoning that scope of constitutional protection must reflect "the impact of a practice on the sense of security that is the true concern of the [Fourth Amendment's] protection of privacy"). A constitutional tort action seeking damages may be a necessary remedy for an innocent person subjected to an unreasonable search and seizure that does not lead to a prosecution because "criminal process remedies are only effective when the government chooses to invoke its criminal powers against an individual." J. Park, The Constitutional Tort Action as Individual Remedy, 38 Harv. C.R.-C.L. L. Rev. 393, 449 (2003); see Brown, 674 N.E.2d at 1141 (stating that exclusion of evidence obtained during unconstitutional seizures had no deterrent value because plaintiffs were "not charged with any crime as the result of their detention").

¶ 45. Finally, the State does not suggest, and we do not find, a viable alternative remedy in a potential common law tort action against the allegedly offending officer. Cf. Long v.

L'Esperance, 166 Vt. 566, 568, 701 A.2d 1048, 1050 (1997) ("Following his arrest by [state trooper] on charge of disorderly conduct, plaintiff brought this action alleging unlawful arrest, false imprisonment, assault, battery, and intentional infliction of emotional distress." (citation omitted)). As the U.S. Supreme Court stated in Bivens, "[t]he interests protected by state laws regulating trespass and the invasion of privacy, and those protected by the Fourth Amendment's guarantee against unreasonable searches and seizures, may be inconsistent or even hostile." 403 U.S. at 394; see Binette, 710 A.2d at 699 (noting "important distinction between the tortious misconduct of one private citizen toward another, on the one hand, and the violation of a citizen's constitutional rights by a police officer, on the other"); Dorwart, 2002 MT 240, ¶ 46 ("Common law causes of action intended to regulate relationships among and between individuals are not adequate to redress the type of damage caused by the invasion of constitutional rights."); Brown, 674 N.E.2d at 1140-41 (stating that plaintiffs' right to recover damages for alleged constitutional torts should not be dependent on availability of common law tort actions, which "are heavily influenced by overriding concerns of adjusting losses and allocating risks, matters that have little relevance when constitutional rights are at stake").

¶ 46. In sum, none of the alternative remedies proffered by the State can substitute as a viable remedy for someone subjected to an allegedly unconstitutional search or seizure, most particularly in a case like this where plaintiff was not charged with a crime. In addition to providing a compensatory remedy for particular individuals whose constitutional rights have been violated by state officials, the adjudication of constitutional torts has played a critical role in establishing specific constitutional limits on governmental power in a way that could not be provided by injunctive relief or common law actions. See J. Park, supra, at 396, 450-53. For the reasons discussed above, we conclude that a private right of action seeking money damages for violations of Article 11 is available directly under that constitutional provision absent any adequate alternative legislatively enacted remedy.

## C. Limiting Principle

¶ 47.    The question remains, however, whether this Court should impose any limitations on this judicially recognized constitutional damage remedy.  In Town Highway, we stated that the caution we raised in Shields about creating a private damage remedy when the Legislature had not created an alternative civil remedy was "magnified in the context of recognizing a tort remedy under the broad mandate of Article 7."  2012 VT 17, ¶ 36.  We concluded, therefore, that in addition to requiring a plaintiff to show the absence of an adequate alternative remedy to vindicate the interest asserted, it was "necessary and appropriate to establish stringent additional requirements to obtain monetary relief for a violation of Article 7."  Id. ¶ 37.  We held that a plaintiff alleging a constitutional tort claim pursuant to Article 7, the Common Benefits Clause, would have to show that: (1) the plaintiff was denied a common benefit; (2) the denial favored another individual or group over the plaintiff; and (3) the decision to deny the benefit to the plaintiff not only "was wholly irrational and arbitrary, but also . . . actuated by personal motives unrelated to the duties of the defendant's official position, such as ill will, vindictiveness, or financial gain."  Id.  We stated that this last element was necessary to "defer to any reasonable and just basis supporting a discretionary judgment by a government decisionmaker" and "to bar routine suits aimed merely at forcing a political body to change its decision, not through representative politics, but through judicial action."  Id. ¶¶ 37-38 (quotation omitted).

¶ 48.    The superior court rejected the State's argument that any establishment of a constitutional tort with respect to alleged violations of Article 11 should be limited by stringent requirements similar to those set forth in Town Highway.  The court rejected this argument in a footnote, summarily stating that recognizing a private right of action under Article 11 would not result in a flood of litigation for routine law enforcement actions and that there is no need for a heightened standard of proof to secure damages because Article 11 provides its own standard— the unreasonable exercise of authority by a state actor.  On appeal, plaintiff argues that the superior

27

court correctly rejected a heightened standard for establishing a private damage remedy under Article 11 and that a qualified immunity limitation is unnecessary to prevent a chilling effect on law enforcement officers when the State rather than the individual officer is subject to liability.

¶ 49.    In considering whether a rigorous standard is appropriate to limit a private damage remedy directly under Article 11, we first note that the U.S. Supreme Court has applied an objective qualified immunity limitation on <u>Bivens</u> actions—the constitutional tort progenitor that itself involved a claim of an unlawful search under the Fourth Amendment.   See <u>Butz v. Economou</u>, 438 U.S. 478, 507 (1978).  We recognize that we are not bound by federal law concerning <u>Bivens</u> actions and that such actions are brought against government officials rather than the government itself.  We also recognize that the U.S. Supreme Court has suggested that there would be less of a deterrent effect on unlawful government action in a suit brought against a governmental agency rather than a government official.[13]  See <u>F.D.I.C. v. Meyer</u>, 510 U.S. 471, 485 (1994).  But the U.S. Supreme Court plainly contemplated that a private direct constitutional damage remedy would not be available every time there was an adjudicated violation of the federal constitution, irrespective of its nature or impact.  See <u>Bivens</u>, 403 U.S. at 410-11 (Harlan, J., concurring) (stating that direct constitutional damage remedy should at least be available "for the most flagrant and patently unjustified sorts of police conduct," keeping in mind that "the countervailing interests in efficient law enforcement of course argue for a protective zone with respect to many types of Fourth Amendment violations").

---

[13]    As noted above, in our view, making the State responsible for the actions of its employees would deter unlawful conduct by motivating the State to better train its employees and to discipline or discharge them when the training proved ineffective.  See <u>Brown</u>, 674 N.E.2d at 194-95.  Moreover, beyond any goals of compensation and deterrence, constitutional tort actions serve to establish and clarify "constitutional rights that both protect individuals from governmental injury and regulate the discretion of the government to inflict injury."  J. Park, <u>supra</u>, at 396.

28

¶ 50. State courts are divided on whether to allow the government to assert common law defenses such as qualified immunity or other limitations in civil rights suits seeking damages for breaches of state constitutional provisions. G. Gildin, supra, at 902-03. Compare Clea v. Mayor and City Council of Balt., 541 A.2d 1303, 1314 (Md. 1988) ("To accord immunity to the responsible government officials, and leave an individual remediless when his constitutional rights are violated, would be inconsistent with the purposes of the constitutional provisions."), and Dorwart, 2002 MT 240, ¶¶ 68-69 (holding that qualified immunity is not applicable to claims alleging violation of rights guaranteed by state constitution because it would be inconsistent with constitutional requirement that courts afford remedy for claims recognized by law), with Moresi, 567 So. 2d at 1094 (adopting qualified immunity in action against state officers acting under color of state law for violations of state constitution), and Spackman v. Bd. of Educ. of the Box Elder Cty. Sch. Dist., 2000 UT 87, ¶¶ 22-25, 16 P.3d 533 (holding that plaintiff seeking damages for alleged constitutional tort must establish that there are no existing alternative remedies and that constitutional violation was flagrant in that it violated clearly established constitutional rights of which reasonable person would have been aware).

¶ 51. State courts have limited constitutional tort actions in other ways as well. Most notably, in Martinez v. City of Schenectady, 761 N.E.2d 560 (N.Y. 2001), the New York Court of Appeals limited the reach of its decision in Brown, in which it had determined that the court of claims had jurisdiction over a constitutional tort claim seeking damages for unconstitutional searches. The suit in Brown was a class action brought by nonwhite males who were stopped and searched by officers investigating a crime, but who were never charged with a crime. A later constitutional tort case was brought by a plaintiff whose drug conviction had been reversed on appeal because it was based on evidence obtained pursuant to an invalid search warrant. In that case, the New York Court of Appeals stated that the constitutional tort remedy it had recognized in Brown was "not boundless" and that, in addition to proving that their constitutional rights had

29

been violated, claimants had to "establish grounds that entitle[d] them to a damages remedy." Martinez, 761 N.E.2d at 563.  The court ruled that recognition of a constitutional tort claim under the circumstances of that case was "neither necessary to effectuate the purposes of the State constitutional protections plaintiff invokes, nor appropriate to ensure full realization of her rights." Id.  The court explained that the deterrence objective of the constitutional tort would "be satisfied . . . by exclusion of the constitutionally challenged evidence," and that the plaintiff had failed to show "how money damages [were] appropriate to ensure full realization of her asserted constitutional rights." Id. at 564.  The court stated that the plaintiff had "not distinguished her case from that of any criminal defendant who ha[d] been granted suppression, or reversal of a conviction, based on technical error at the trial level," and that she had "shown no grounds that would entitle her to a damage remedy in addition to the substantial benefit she already ha[d] received from dismissal of the indictment and release from incarceration." Id.

¶ 52.  We conclude that, in the absence of any applicable legislation addressing constitutional torts, restrictions similar to those imposed in Town Highway are appropriate and necessary in civil actions seeking damages for violations of Article 11.  The principal concerns that caused us in Town Highway to impose limitations on obtaining damages for claimed deprivations of common benefits, in violation of Article 7, were the potential flood of litigation for every alleged constitutional violation and the potential chilling effect on citizens serving on local boards.  2012 VT 17, ¶¶ 52, 56.  We have similar concerns in the context of this case.  On a daily basis, law enforcement officers must make numerous decisions on how to handle interactions with citizens, particularly motorists.  Even with liability falling on the State rather than the individual officer, a rule that exposes the State to a potential civil damages suit following every roadside stop, or whenever a motion to suppress is granted, could inhibit law enforcement officers from taking some effective and constitutionally permissible actions in pursuit of public safety. This would not be an appropriate result.

30

¶ 53.    Accordingly, imposing restrictions akin to qualified immunity is appropriate.  See id. ¶ 57 (stating that imposing restrictions on constitutional torts "serves the equivalent function of the qualified immunity doctrine" and acts "as a buffer against liability in all but the most egregious of cases"); see also M. Wells, Civil Recourse, Damages-As-Redress, and Constitutional Torts, 46 Ga. L. Rev. 1003, 1038-39 (2012) (noting that U.S. Supreme Court has justified qualified immunity "as an accommodation between the social value in compensating the plaintiff and deterring constitutional violations, on the one hand, and the social need to avoid overdeterrence of bold and effective official action, on the other"); L. Rosenthal, A Theory of Governmental Damages Liability: Torts, Constitutional Torts, and Takings, 9 U. Pa. J. Const. L. 797, 800, 856 (2007) (opining that although discretionary and categorical immunities are inappropriate for constitutional violations, damages-limiting doctrines such as qualified immunity are appropriate to "protect the interests of the taxpayers and avoid unwarranted reallocation of scarce public resources"); cf. Anderson v. Creighton, 483 U.S. 635, 643-44 (1987) (rejecting plaintiff's argument in Bivens action "that it is inappropriate to give officials alleged to have violated the Fourth Amendment—and thus necessarily to have unreasonably search or seized—the protection of a qualified immunity intended only to protect reasonable official action").  Although we have rejected herein a blanket governmental immunity from constitutional tort actions, we are cognizant of our need to be cautious when judicially recognizing potential damage liability to be imposed on another branch of government.  See D. Dobbs et al., The Law of Torts § 334, at 331 (2d ed. 2011) (retaining limited immunity prevents judicial branch from intruding upon functions of legislative and executive branches through adjudication of tort suits); see also Meyer, 510 U.S. at 486 ("If we were to recognize a direct action for damages against federal agencies, we would be creating a potentially enormous financial burden for the Federal Government.").

¶ 54.    With these considerations in mind, we hold that a plaintiff seeking damages against the State directly under Article 11 based on a law enforcement officer's alleged violation of that

31

constitutional provision must show that: (1) the officer violated Article 11; (2) there is no meaningful alternative remedy in the context of that particular case; and (3) the officer either knew or should have known that the officer was violating clearly established law or the officer acted in bad faith. Cf. Spackman, 2000 UT 87, ¶ 23 (stating that requiring flagrant conduct "ensures that a government employee is allowed the ordinary human frailties of forgetfulness, distractibility, or misjudgment without rendering [him or her]self liable for a constitutional violation" (quotation omitted)). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Mullenix v. Luna, ___ U.S. ___, ___, 136 S. Ct. 305, 308 (2015) (quotation omitted); see Anderson, 483 U.S. at 641 (stating that relevant question is "whether a reasonable officer could have believed [the] warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed"). "This 'clearly established' standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can reasonably anticipate when their conduct may give rise to liability for damages." Reichle v. Howards, 566 U.S. 658, 664 (2012) (quotations omitted); see Malley v. Briggs, 475 U.S. 335, 341 (1986) (noting that qualified immunity's clearly-established-right test protects "all but the plainly incompetent or those who knowingly violate the law"). On the other hand, bad faith, which may exist even when the officer's conduct could be viewed as objectively reasonable, is characterized by ill will or wrongful motive, including discriminatory animus.

¶ 55.    The third element set forth above includes a potential alternative showing of bad faith that in some instances would require the factfinder to make an objective assessment of the officer's subjective motivations. We recognize that the U.S. Supreme Court has abandoned a subjectively based malice component that would defeat a qualified immunity defense, reasoning that a judicial inquiry into subjective motivation might entail broad-ranging discovery that is inherently incompatible with immunity from suit. See Harlow v. Fitzgerald, 457 U.S. 800, 815-

18 (1982). We also recognize that plaintiff is suing the State, and that qualified immunity is generally recognized as a common law defense against government officials. We emphasize, however, that the third element set forth above, although akin to qualified immunity in some respects, is not an immunity from suit but rather an element that a plaintiff must prove to obtain damages in a civil action directly under Article 11 for alleged constitutional violations.

¶ 56. To the extent that the element is similar to qualified immunity, imposing such an element is appropriate not only for the reasons discussed above, but because a plaintiff's claims against the State in such circumstances will generally be derivative of a law enforcement officer's actions. Cf. Czechorowski v. State, 2005 VT 40, ¶ 28, 178 Vt. 524, 872 A.2d 883 (mem.) (rejecting plaintiff's argument that trial court erred by immunizing State from suit for actions of its employees because "claims against the State are derivative of the claims against the individual defendants"). Moreover, we emphasize that although subjective motivation may often have to be resolved by the factfinder, a plaintiff cannot withstand summary judgment without producing colorable facts upon which a reasonable jury could find bad faith. Cf. Lee v. Cline, 863 A.2d 297, 312 (Md. 2004) (concluding that there was jury question with regard to malice where officer sought to search plaintiff's car without cause or consent, officer unnecessarily and unjustifiably extended stop for suspected motor vehicle violation in order to obtain canine unit, and officer unjustifiably labeled plaintiff as uncooperative).

## IV. The Alleged Violations

### A. The Stop

¶ 57. Having rejected the State's claim of blanket immunity and established the standard for evaluating plaintiff's constitutional tort claim, we now examine each of the alleged Article 11 violations. Plaintiff first challenges Trooper Hatch's decision to stop his vehicle. The law on vehicle stops is well-settled. Like the Fourth Amendment, Article 11 "protect[s] citizens against unreasonable searches and seizures." State v. Manning, 2015 VT 124, ¶ 11, 200 Vt. 423, 132 A.3d

716; see State v. Berard, 154 Vt. 306, 309, 576 A.2d 118, 120 (1990) (noting that Article 11 imports Fourth Amendment's "reasonableness" standard). The temporary stop of a vehicle is a seizure subject to Article 11 protection from governmental invasions of privacy. State v. Winters, 2015 VT 116, ¶ 13, 200 Vt. 296, 131 A.2d 186.

¶ 58. Although seizures normally require that a law enforcement officer have probable cause to believe that the person being seized has engaged in criminal activity, the lesser standard of reasonable suspicion of either criminal activity or even a minor traffic violation can form the basis of a valid temporary stop. State v. Tuma, 2013 VT 70, ¶ 8, 194 Vt. 345, 79 A.3d 883 ("[E]ven a minor traffic infraction can be the basis of a traffic stop."); see Manning, 2015 VT 124, ¶ 12 (stating that "an officer's reasonable suspicion of a traffic violation can form the basis for a lawful stop"); State v. Lussier, 171 Vt. 19, 34, 757 A.2d 1017, 1027 (2000) ("[T]he law is well-settled that police may stop a vehicle and briefly detain its occupants to investigate a reasonable and articulable suspicion that a motor vehicle violation is taking place."). The detention, however, "must be temporary and last no longer than necessary to effectuate the purpose of the stop," unless "an officer gathers additional information providing reasonable suspicion that some other criminal activity is afoot," in which case "the officer may extend the detention to investigate that activity." Winters, 2015 VT 116, ¶ 14.

¶ 59. "The level of suspicion required for a lawful investigatory stop is considerably less than a preponderance of the evidence, but it must be more than an inchoate and unparticularized suspicion or hunch." State v. Thompson, 175 Vt. 470, 471, 816 A.2d 550, 552 (2002) (mem.) (quotation omitted). "In determining whether an officer had reasonable suspicion to effectuate a seizure or extend an investigative detention, we look at the totality of the circumstances." Manning, 2015 VT 124, ¶ 14. "In determining the legality of a stop, courts do not attempt to divine the arresting officer's actual subjective motivation for making the stop; rather, they consider from an objective standpoint whether, given all of the circumstances, the officer had a reasonable and

34

articulable suspicion of wrongdoing." Lussier, 171 Vt. at 23-24, 757 A.2d at 1020; see State v. Rutter, 2011 VT 13, ¶ 16, 189 Vt. 574, 15 A.3d 132 (mem.) ("We conclude that the protections of Article 11 do not extend to prohibiting law enforcement officers from stopping motor vehicles where there is an objectively reasonable suspicion that a motor vehicle violation has occurred, even if in a particular situation these infractions may appear 'trivial' or the officer's motivation is suspect.").

¶ 60.    Here, the parties debate whether there actually was a motor vehicle infraction justifying the stop and, if there was not, whether this Court should adopt under Article 11 the U.S. Supreme Court's holding in Heien that a stop based on a law enforcement officer's objectively reasonable mistake of law as to whether there was a motor vehicle violation may "rise to the reasonable suspicion necessary to uphold the seizure under the Fourth Amendment."[14]  Heien, ___

_____

[14]  Regarding the latter argument, plaintiff contends that adopting the Heien holding would be inconsistent with the broader protection we have established under Article 11, see State v. Pitts, 2009 VT 51, ¶ 19, 186 Vt. 71, 978 A.2d 14 (stating that this Court has construed Article 11 to provide greater protection than Fourth Amendment and has "regularly invoked this principle to place reasonable restrictions on the scope of police authority to detain and search citizens"), particularly with respect to our rejection under Article 11 of the U.S. Supreme Court's good-faith exception to the exclusionary rule pursuant to the Fourth Amendment, see State v. Oakes, 157 Vt. 171, 172, 598 A.2d 119, 120 (1991) (declining to adopt holding in United States v. Leon, 468 U.S. 897 (1984)).  Plaintiff asserts that this Court has rejected the balancing test that the U.S. Supreme Court applies in its Fourth Amendment jurisprudence, see State v. Savva, 159 Vt. 75, 85-86, 616 A.2d 774, 780 (1991) (stating that Article 11's warrant requirement itself reflects "the balance reached by the constitutional drafters, a balance in which the individual's interest in privacy outweighs the burdens imposed on law enforcement"), as exemplified by our rejection of the good-faith exception to the exclusionary rule.  See Oakes, 157 Vt. at 183, 598 A.2d at 126-27 ("We will not impose such a significant limitation upon our state exclusionary rule on the basis of the [U.S. Supreme] Court's cost-benefit analysis in Leon.").  The State responds that the Heien standard for determining the existence of a reasonable mistake of law—whether there was an objectively reasonable interpretation of a genuinely ambiguous statute, see Heien, ___ U.S. at ___, 135 S. Ct. at 541 (Kagan, J., concurring)—is an appropriate standard for determining whether there exists reasonable suspicion for a stop under Article 11.  In support of this contention, the State asserts that no clear distinction can be drawn between reasonable mistakes of law and fact and that allowing mistakes of law to justify stops will not have any repercussions distinct from those resulting from allowing reasonable mistakes of fact to justify stops.  See State v. Roberts, 160 Vt. 385, 391, 393, 631 A.2d 835, 839, 840 (1993) (concluding under Article 11 and Fourth Amendment "that, if the officer had a reasonable belief that the premises had been abandoned, his entry was lawful even if the premises had not been abandoned").  Courts have noted the difficulty

35

U.S. at ___, 135 U.S. at 534; see id. at 541 (Kagan, J., concurring) ("If the statute is genuinely ambiguous, such that overturning the officer's judgment requires hard interpretive work, then the officer has made a reasonable mistake.");[15] see also State v. Hurley, 2015 VT 46, ¶¶ 19-21, 198 Vt. 552, 117 A.3d 433 (concluding that motor vehicle operator did not violate statute at issue, but that defendant's challenge to stop under Fourth Amendment was unavailing because statute was genuinely ambiguous and thus officer's misapprehension of statute provided objectively reasonable basis to allow stop pursuant to holding in Heien). We need not resolve this issue because, as explained below, we conclude that any mistake of law in this case was not objectively reasonable under the standard advocated by the State and set forth in Justice Kagan's concurrence in Heien.[16]

¶ 61. The State relies upon the then-current version of 23 V.S.A. § 511 to support Trooper Hatch's stop of plaintiff's vehicle. The statute, titled "Manner of display," is within the

---

of distinguishing mistakes of law and fact, see People v. Glick, 203 Cal. App. 3d 796, 801 (Cal. Ct. App. 1988) (noting that distinction between mistake of fact and mistake of law "is often hard to draw"), and have at times disagreed as to whether a mistake was one of law or fact. Compare United States v. Pena-Montes, 589 F.3d 1048, 1054, 1064 (10th Cir. 2009) (majority and dissent disagree about whether officer's mistake regarding dealer plates was one of law or fact), with State v. Horton, 246 P.3d 673, 676-77 (Idaho Ct. App. 2010) (noting that mistakes of fact and law are inextricably connected and concluding that officer's mistake regarding repossession plates "was primarily one of fact, not one of law").

[15] As noted by Justice Sotomayor's dissent in Heien, all but one of the federal circuit courts, and five states, had previously "held that police mistakes of law [could not be] a factor in the reasonableness inquiry." ___ U.S. at ___ n.1, 135 S. Ct. at 544 n.1.

[16] In Lussier, the defendants in separate consolidated cases challenged motor vehicle stops based on their contention that they had not violated the statutes at issue. We upheld one conviction, concluding that the State had demonstrated a reasonable and articulable basis for the stop because the defendant violated the statute, and we reversed the other conviction, concluding that the State had failed to demonstrate a reasonable and articulable basis for the stop because the defendant did not violate the statute. Lussier, 171 Vt. at 35-37, 757 A.2d at 1028-29. However, the parties did not raise, and we did not address, whether the statutes involved were ambiguous or, if they were, whether the stops could have been justified as long as the officers had an objectively reasonable basis to believe that violations of motor vehicle laws had occurred—even if they had not occurred.

36

subchapter heading titled, "Display of Number Plates." At the time of the stop in question in this case, § 511 provided in its entirety as follows, with the key sentence highlighted:

> A motor vehicle operated on a public highway shall have displayed in a conspicuous place either one or two number plates as the commissioner of motor vehicles may require. Such number plates shall be furnished by the commissioner of motor vehicles, showing the number assigned to such vehicle by the commissioner. If only one number plate is furnished, the same shall be securely attached to the rear of the vehicle. If two are furnished, one shall be securely attached to the rear and one to the front of the vehicle. The number plates shall be kept entirely unobscured, the numerals and the letters thereon shall be plainly legible at all times. They shall be kept horizontal, shall be so fastened as not to swing, excepting however, there may be installed on a motor truck or truck tractor a device which would, upon contact with a substantial object, permit the rear number plate to swing toward the front of the vehicle, provided such device automatically returns the number plate to its original rigid position after contact is released, and the ground clearance of the lower edges thereof shall be established by the commissioner pursuant to the provisions of chapter 25 of Title 3. A person shall not operate a motor vehicle unless the number plates are displayed as provided in this section.

23 V.S.A. § 511 (2014) (emphasis added).

¶ 62. We enforce unambiguous statutes according to their plain language to effectuate legislative intent, without the need to resort to legislative history. State v. Porter, 2012 VT 97, ¶ 10, 192 Vt. 601, 70 A.3d 915. The plain language of the former § 511 provided that the identifying numerals and letters of a license plate had to remain "entirely unobscured" so that vehicles could be readily identified. See Tuma, 2013 VT 70, ¶ 12 (stating that "all of the mandates of § 511 governing the manner of display of license plates are related to visibility and readability of the plate"); see also 23 V.S.A. § 304(b)(2)(B) ("[T]he primary purpose of motor vehicle number plates is vehicle identification."); Martin v. State, 2003 VT 14, ¶ 43, 175 Vt. 80, 819 A.2d 742 (Johnson, J., dissenting) ("[T]he stated goal of Vermont in issuing . . . license plates . . . is to aid in vehicle identification."). Thus, under the former § 511, a license plate was not obscured unless the identifying numerals and letters were obscured. Although a registration sticker contains small

numbers and letters and is affixed to a corner of the plate, those numbers and letters do not serve the purpose of identifying the vehicle. Hence, an obscured registration sticker did not violate the former § 511.

¶ 63. Our decision in Tuma is instructive in this regard. There, relying on § 511's requirement that number plates "be kept horizontal," a police officer stopped the defendant's vehicle based on his observation that one side of the front license plate was one to two inches below the other side. Without finding the need to examine § 511's legislative history, we upheld the trial court's grant of the defendant's motion challenging the legality of the stop, holding that "a proper reading of the statute" is "that a license plate ceases to be 'horizontal' when the angle of the license makes it difficult for a person with normal vision to read it." Tuma, 2013 VT 70, ¶¶ 12, 14. Because the prosecution had failed to present any evidence that the numerals or letters on the plate were not legible as the result of the plate's positioning, it could not show that the officer had reason to suspect that the defendant had violated § 511, which was aimed at ensuring the visibility and readability of number plates. Id. ¶¶ 8, 15.

¶ 64. The same is true here. Even if we were to adopt the Heien concurrence allowing seizures based on a law enforcement officer's objectively reasonable mistake as to the meaning of a genuinely ambiguous statute, it would not benefit the State in this case because the statute at issue is not genuinely ambiguous, and thus the State cannot show that Trooper Hatch had an objectively reasonable basis for concluding that plaintiff had violated the statute.[17]

---

[17] The majority in Heien did not set forth a standard for determining whether a law enforcement officer's mistaken interpretation of a law was objectively reasonable, but the concurrence emphasized that, to pass constitutional muster, the mistake would have to be one of those rare instances where the statute was "genuinely ambiguous, such that overturning the officer's judgment [would] require[] hard interpretive work." Heien, ___ U.S. at ___, 135 S. Ct. at 541 (Kagan, J., concurring). Since then, other courts, including this Court, have referred to the standard espoused in the Heien concurrence. See Hurley, 2015 VT 46, ¶¶ 16, 20 (acknowledging that broad interpretation of statutes to support reasonable basis for motor vehicle stops could impinge on driver's constitutional privacy interests, and emphasizing high bar Heien concurrence set for determining when motor vehicle stops can be predicated on objectively reasonable mistake

¶ 65. Our conclusion is supported by the Legislature's enactment of the 2014 Amendment to § 511, which plainly created a new statutory obligation by requiring that registration stickers be unobstructed. See Doe v. Vt. Office of Health Access, 2012 VT 15A, ¶ 26, 191 Vt. 517, 54 A.3d 474 ("We presume that the Legislature intended to change the meaning of a statute when it amends it, but we will recognize clarification of the law where the circumstances clearly indicate it was intended." (quotation omitted)). In relevant part, § 511 was amended in 2014 as follows:

> (a) . . . . The number plates shall be kept entirely unobscured, and the numerals and the letters thereon shall be plainly legible at all times.
>
> . . . .
>
> (b) A registration validation sticker shall be unobstructed, and shall be affixed as follows:
>
> . . . .
>
> (c) A person shall not operate a motor vehicle unless number plates and a validation sticker are displayed as provided in this section.

2013, No. 189 (Adj. Sess.), § 4.

¶ 66. Thus, there were three changes to § 511. First, the word "and" was inserted between the two clauses of section (a)—thereby indicating that henceforth keeping the number plates entirely unobscured is an additional requirement and not merely tied to the purpose of keeping the number plates' letters and numbers legible to allow identification of vehicles. Id. Second, section (b) was added to require that validation stickers be unobstructed. And third, the phrase "and a validation sticker" was added to the last sentence of § 511, thereby indicating that henceforth a person operating a motor vehicle must display as provided a validation sticker in addition to number plates. Id. These three changes complement each other and demonstrate that

of law pursuant to Fourth Amendment); see also State v. Dopslaf, 2015-NMCA-098, ¶¶ 16-17, 356 P.3d 559 (referring to standard set forth in Heien concurrence in determining that officer's stop of defendant's vehicle was based on objectively reasonable mistake of law).

the Legislature amended § 511 to add the requirement that registration stickers be displayed and kept unobscured, thus making the failure to display an unobscured validation sticker a motor vehicle violation.

¶ 67.    The State points to the then-current version of 23 V.S.A. § 305(c), which at the time of the stop in question provided, in relevant part, that "no plate is valid for the second and succeeding years unless the [registration] sticker is affixed to the rear plate in the manner prescribed by the Commissioner."  The same act that amended § 511 amended § 305(c) to remove the words "for the second and succeeding years" and add the phrase "in section 511 of this title." 2013 No. 189 (Adj. Sess.), § 3.  Nothing in the plain language of the then-current version of § 305(c) provided Trooper Hatch with a reasonably objective belief that plaintiff was in violation of a motor vehicle law when he stopped plaintiff's vehicle.[18]

---

[18]    Relying on Thompson, 175 Vt. at 471-72, 816 A.2d at 552-53, the State also cites the state inspection manual as requiring inspectors to ensure that the registration sticker is unobstructed.  See Vermont Periodic Inspection Manual, at CAR 1.2, http://dmv.vermont.gov /sites/dmv/files/documents/DMV-VN112-Vehicle_Inspection_Manual.pdf [https://perma.cc/SM K2-GDJS].  The State does not indicate that the cited portion of the manual was in place at the time of the incident in question.  In any event, the State's reliance on Thompson is unavailing.  In the cases consolidated in Thompson, the defendants were stopped because in one case the vehicle was missing a bumper and in the other case a side rearview mirror.  Because the inspection manual required that any car manufactured with a bumper or a rearview mirror must have them to pass inspection, and the officers who stopped the vehicles could not tell at night whether the vehicles had current inspection stickers, we concluded that the stops were supported by a reasonable and articulable suspicion that a motor vehicle violation had occurred.  Id. at 472, 816 A.2d at 553.  In so ruling, we emphasized that the vehicles in their condition would not have passed inspection.  Id. Here, in contrast, the undisputed facts indicate that, at best from the perspective of the State, plaintiff had a visible registration sticker affixed to his vehicle's rear plate at the time of the stop, but that it was partially covered by snow temporarily because of the weather.  This is not a situation where the officer had an objectively reasonable basis to assume that plaintiff was driving a vehicle that could not pass inspection or that posed a public safety hazard.  We decline to extend our reasoning in Thompson beyond situations where observed violations of the inspection manual give rise to a reasonable suspicion that a vehicle is being operated without a valid inspection sticker— which was not the case here.  Cf. Hurley, 2015 VT 46, ¶ 17 (rejecting broad interpretation of motor vehicle statute that "would significantly reduce the personal liberty of drivers, and passengers, on Vermont's highways by subjecting a substantial proportion of them to police stops without any commensurate benefit to public safety").

¶ 68. Accordingly, we conclude that Trooper Hatch's stop of plaintiff's vehicle violated Article 11 because it was not supported by a reasonable and articulable suspicion that plaintiff had committed a motor vehicle violation. Although our inquiry would most likely end at this point if this were an appeal from a criminal conviction or a civil suspension violation, in which the fruits of any illegal stop would be suppressed, in this civil constitutional tort action against the State, we must examine plaintiff's other allegations that his Article 11 rights were violated during the incident in question. See Townes v. City of New York, 176 F.3d 138, 145 (2d Cir. 1999) (stating that "[t]he fruit of the poisonous tree doctrine is an evidentiary rule that operates in the context of criminal procedure" and "has generally been held to apply only in criminal trials" (quotation omitted)).

¶ 69. As the Second Circuit reasoned in Townes, § 1983 actions alleging constitutional torts are analogous to common law actions aimed at compensation, and thus they generally employ the principle of proximate cause to determine damages; whereas, the fruit of the poisonous tree doctrine disregards traditional causation analysis to serve the objective of deterring unlawful police conduct by creating an incentive for state actors to respect suspects' constitutional rights. Id. at 145-46. Because "[t]he fruit of the poisonous tree doctrine is not available to elongate the chain of causation," id. at 146, and "constitutional tort liability . . . is limited to the kind of injury that [the constitutional right at issue] was designed to prevent," id. at 148 (quotation omitted, alteration in original), "police-civilian interactions [are] discrete links that must be analyzed largely independent of what came before or after; damages are tied tightly to the specific right associated with each link and tend not to expand into other stages of the interactions." Willis v. Mullins, No. 1:04-CV-6542 AWI BAM, 2017 WL 3208714, at *4 (E.D. Cal. July 28, 2017); see also Foster v. Land, No. 2:16-cv-45 RLM, 2017 WL 6805319, at *5 (N.D. Ind. Nov. 16, 2017) (stating "that because the 'fruit of the poisonous tree' rationale doesn't apply in suits for constitutional torts, lack of probable cause to stop and search doesn't affect the reasonableness of an ensuing arrest,"

41

and, "[b]y the same reasoning, an unreasonable stop, if found by the jury, wouldn't affect [the officer's] entitlement to immunity from any constitutional claim arising from the arrest or from the seizure and inventory search of the automobile").

¶ 70. Because a jury could determine that one or more of the alleged Article 11 violations does not satisfy the elements for seeking damages to remedy the alleged violations, we must examine each of the alleged violations.

## B. The Exit Order

¶ 71. Plaintiff also argues that his Article 11 rights were violated when Trooper Hatch ordered him to exit his car. In Sprague, this Court held that an exit order following a traffic stop offends Article 11 unless "the objective facts and circumstances would support a reasonable suspicion that the safety of the officer, or of others, was at risk or that a crime has been committed." 2003 VT 20, ¶ 16. We declined to adopt under Article 11 the U.S. Supreme Court's determination pursuant to the Fourth Amendment that police officers could automatically order a driver to exit a vehicle following a routine traffic stop, which we believed would "invite[] arbitrary, if not discriminatory, enforcement." Id. ¶¶ 1, 19 (explicitly rejecting U.S. Supreme Court's majority holding in Pennsylvania v. Mimms, 434 U.S. 106 (1977)); see Mimms, 434 U.S. at 122 (Stevens, J., dissenting) (stating that majority holding would subject some citizens to indignity of exit orders, but not "others—perhaps those with more expensive cars, or different bumper stickers, or different-colored skin"). We concluded that requiring an objective justification for exit orders recognized the need to ensure the safety of law enforcement officers while enforcing "the constitutional imperative of requiring individualized, accountable decision-making for every governmental intrusion upon personal liberties." Sprague, 2003 VT 20, ¶ 16.

¶ 72. Here, nothing in the record suggests that Trooper Hatch feared for his safety or the safety of others—and the State makes no such argument. Thus, to pass muster under Article 11, the exit order must have been based on reasonable suspicion of criminal wrongdoing, which must

arise from "specific and articulable facts" rather than an "inchoate and unparticularized suspicion or hunch." See State v. Alexander, 2016 VT 19, ¶ 21, 201 Vt. 329, 139 A.3d 574 (quotations omitted); see also Cunningham, 2008 VT 43, ¶ 40 ("[A]ny expansion of the stop into a drug investigation require[s] a reasonable, articulable, suspicion that defendant was committing a drug-related crime."). We look to the totality of the circumstances to determine if an officer had an objective reasonable suspicion of criminal wrongdoing. Manning, 2015 VT 124, ¶ 14.

¶ 73.   In this case, the superior court concluded that the faint odor of burnt marijuana, along with what appeared to be masking paraphernalia—a bottle of Visine eyedrops and an air freshener—justified the exit order based on the officer's reasonable suspicion that plaintiff had additional contraband on his person or in the car.[19]

¶ 74.   We agree that, in and of itself, the exit order was lawful, but not on the basis relied upon by the superior court. Operating a motor vehicle while under the influence of alcohol or "any other drug" was a criminal offense at the time of the stop and remains so. 23 V.S.A. § 1201(a)(2)-

---

[19] With respect to the exit order and the seizure and search of plaintiff's vehicle, the parties extensively debate the significance of the fact that at the time of the stop adult possession of less than one ounce of marijuana was not a crime but rather a civil violation subject only to a fine. Compare 18 V.S.A. § 4230a(a)-(b) (2017), with 2017, No. 86 (Adj. Sess.), § 4 (amending § 4230a to remove all criminal and civil penalties for adult possession of one ounce or less of marijuana). Plaintiff contends that Article 11 does not permit exit orders for suspected civil violations and that, in this case, Trooper Hatch had no objectively reasonable suspicion that plaintiff had in his possession more than one ounce of marijuana. On that basis, plaintiff seeks to distinguish State v. Ford, where we upheld an exit order based in part on the odor of marijuana emanating from the vehicle. 2007 VT 107, ¶¶ 2, 8, 182 Vt. 421, 940 A.2d 687 (upholding legality of exit order where police officer received anonymous tip that woman and bald man had been using illegal drugs while driving on interstate and police smelled odor of marijuana upon approaching parked vehicle). The State counters that, in decriminalizing marijuana, the Legislature explicitly provided that it did not "intend[] to affect the search and seizure laws afforded to duly authorized law enforcement officers" and that marijuana remained contraband pursuant to 18 V.S.A. § 4242 "subject to seizure and forfeiture" unless possessed lawfully for therapeutic use. Id. § 4230a(c)(2) (2017). In this instance these statutes do not inform our determination of whether the exit order and seizure of plaintiff's vehicle violated Article 11.

(3);[20] see 18 V.S.A. § 4230a(c)(1) (2017) (stating that section decriminalizing adult possession of less than one ounce of marijuana "does not exempt any person from arrest or prosecution for being under the influence of marijuana while operating a vehicle of any kind and shall not be construed to repeal or modify existing laws or policies concerning the operation of vehicles of any kind while under the influence of marijuana"); see also 2017, No. 86 (Adj. Sess.), § 4 (deleting § 4230a(c)(1) but adding equivalent language in § 4230a(b)(2)). Trooper Hatch indicated that he detected the faint odor of burnt marijuana when he approached plaintiff's car after stopping plaintiff. He also observed items that, although they have perfectly common and legal uses, he knew from his experience in law enforcement to be used to mask the effects of marijuana use. In his deposition testimony, Trooper Hatch indicated that the faint odor of burnt marijuana emanating from plaintiff's car and the redness of plaintiff's eyes[21] aroused his suspicion that plaintiff was driving while impaired, but he agreed that his suspicion of plaintiff's impaired driving dissipated during the course of his discussions with plaintiff. Although it is not entirely clear from the record when Trooper Hatch's suspicion of impairment dissipated, that may have occurred following the exit order, as the superior court suggested in its decision.

¶ 75. We conclude that the faint smell of burnt marijuana, in conjunction with the trooper's observations of items that may be used to mask the effects of smoking marijuana, provided the trooper with an articulable and reasonable basis to order plaintiff to exit his vehicle to determine whether plaintiff was driving impaired. Cf. State v. Young, 2010 VT 97, ¶ 21, 189

---

[20] In 2014, after the instant stop occurred, the Legislature amended § 1201(a)(3) by deleting the phrase, "to a degree which renders the person incapable of driving safely," which had followed the words, "and any other drug." See 2013, No. 169 (Adj. Sess.), § 1. This fact has no impact on our analysis.

[21] Neither Trooper Hatch in his application for a search warrant, nor the State in its statement of undisputed facts, indicated that the trooper observed redness in plaintiff's eyes following the stop.

Vt. 37, 12 A.3d 510 (concluding that "the strong smell of alcohol and defendant's slurred speech are sufficient indicia of driving under the influence to allow the officer to go further and initiate field sobriety exercises"); State v. Santimore, 2009 VT 104, ¶ 8, 186 Vt. 638, 987 A.2d 332 (mem.) ("Indicia of intoxication, such as an officer's detection of the odor of alcohol emanating from a driver as well as observation of a driver's watery and bloodshot eyes, are sufficient to establish reasonable suspicion of DUI."); State v. Mara, 2009 VT 96A, 186 Vt. 389, 987 A.2d 939 (concluding that police officer was justified in ordering defendant to exit vehicle after defendant admitted to having drunk alcohol and officer detected odor of alcohol and observed defendant's bloodshot and watery eyes). In so concluding, we acknowledge that Trooper Hatch did not observe any indication of erratic driving on plaintiff's part. Moreover, we acknowledge that Trooper Hatch admitted in his deposition testimony that he did not ask plaintiff to engage in any field dexterity exercises after plaintiff exited his vehicle. Although these facts could conceivably inform a factfinder's determination as to the existence of bad faith in the overall interaction between plaintiff and Officer Hatch, cf. State v. Goff, 239 P.3d 467, 471 (Kan. Ct. App. 2010) ("The trial court had to have found the officer's testimony that he smelled marijuana was credible to have found the officer had probable cause."), we conclude that, from an objective viewpoint, there was a reasonable basis to support the exit order under our Article 11 jurisprudence. Accordingly, the exit order does not support a claim of damages.

## C. The Seizure and Search of Plaintiff's Vehicle

¶ 76. The subsequent seizure and search of plaintiff's vehicle, which had to be supported by probable cause rather than the less-rigorous standard of reasonable suspicion, is another matter, however. See State v. Platt, 154 Vt. 179, 184, 574 A.2d 789, 792 (1990) (requiring, pursuant to Article 11, probable cause and exigent circumstances to support warrantless seizure of car followed by post-seizure search pursuant to warrant). "The finding of probable cause is a decidedly fact-specific determination, turning on whether the particular circumstances establish a

45

nexus between the crime, the suspect, and the place to be searched." State v. Bauder, 2007 VT 16, ¶ 25, 181 Vt. 392, 924 A.2d 38 (quotation omitted). "The concept of probable cause is a practical, nontechnical one that we evaluate in a common sense manner" based on "the totality of the circumstances." State v. Guzman, 2008 VT 116, ¶ 11, 184 Vt. 518, 965 A.2d 544 (quotation omitted); see People v. Zuniga, 2016 CO 52, ¶ 16, 372 P.3d 1052 ("[T]he totality of the circumstances test for probable cause is an all-things-considered approach that calls for consideration of any and all facts that a reasonable person would consider relevant to a police officer's belief that contraband or evidence of a crime is present." (quotation omitted)).

¶ 77.    We now examine the facts upon which Trooper Hatch relied to seize plaintiff's vehicle. Following his exit order, Trooper Hatch found no incriminating evidence resulting from the consented search of plaintiff's person. Further, as noted, any suspicions that the trooper may have had about plaintiff driving while impaired had been allayed. Nonetheless, Trooper Hatch elected to seize plaintiff's vehicle and tow it to the Rutland state police barracks based on his original detection of a faint odor of burnt marijuana, the presence of the air freshener and the bottle of Visine in plaintiff's vehicle, and plaintiff's acknowledgment that he had smoked marijuana in the past few days. With the trooper's concerns about impaired driving dispelled and his attention turned to possible possession of marijuana, we agree with the superior court that the presence of the air freshener and the Visine in the vehicle, as well as plaintiff's acknowledgment of prior marijuana use by him sometime in the last few days, lost their probative value. Air fresheners and eye drops, though they can be used to mask the effects of marijuana use, are commonplace items ubiquitously used by persons who do not use marijuana, and their presence in the car did not indicate the presence of marijuana. Nor does the fact that plaintiff smoked marijuana in the past indicate the presence of marijuana in the vehicle at the time of the stop.

¶ 78.    Thus, as the superior court acknowledged, we are left only with the faint odor of burnt marijuana as a justification for the vehicle's seizure and subsequent search. The court

46

concluded that that was enough. We disagree. We have concluded "that the odor of marijuana, detected by a trained and experienced police officer, can provide a reasonable basis to believe that marijuana is present," but also "that the odor alone may not always be sufficient [to provide probable cause] to arrest an individual." Guzman, 2008 VT 116, ¶ 14 (noting caution by other courts that "the odor of marijuana will not always produce probable cause to search or to arrest," but rather is one factor "within the context of the entire factual situation" under which "the grounds for probable cause must be examined"); see Zuniga, 2016 CO 52, ¶ 23 ("[T]he odor of marijuana is relevant to the totality of the circumstances test and can contribute to a probable cause determination.").

¶ 79. In Guzman, a police officer stopped the defendant for speeding and, following the stop, "detected the distinct odor of marijuana coming from defendant's vehicle." 2008 VT 116, ¶ 2. The defendant acted very nervous "and was sweating, fidgeting, and moving his hands around the vehicle," which caused the officer to be concerned that the defendant had a weapon. Id. Following an exit order, the officer smelled the odor of marijuana on the defendant's person and, after patting him down, found, among other things, a packet of fresh marijuana and cocaine. We concluded that the search was permissible incident to an arrest supported by probable cause "given the odor of marijuana from the car, followed by the stronger odor of marijuana that [the officer] detected coming from defendant's person—the only individual present, combined with the officer's other observations of defendant's suspicious conduct." Id. ¶ 15.

¶ 80. In another case in which we considered the odor of marijuana as a factor in determining whether probable cause existed, State v. Senna, 2013 VT 67, 194 Vt. 283, 79 A.3d 45, police officers investigating a complaint about a screaming child arrived at the house where the child was located and noted the odor of fresh marijuana, which got stronger as the officers approached the door. Upon learning from the defendant's neighbors that the defendant and his partner were using heroin and selling marijuana out of their residence, the officers obtained a

47

warrant to search the residence. We considered "whether, in light of Vermont's 'medical marijuana' law, the smell of fresh marijuana outside the entry to a home can be a factor supporting a finding of probable cause to search the house." Id. ¶ 9. We concluded that, notwithstanding the small possibility that someone in the residence was a registered medical patient immune from prosecution, "the trial court properly considered the odor of fresh marijuana emanating from defendant's home in assessing probable cause to search his residence." Id. ¶ 16; see State v. Greenslit, 151 Vt. 225, 228, 559 A.2d 672, 674 (1989) (concluding that odor of burning marijuana emanating from vehicle, along with contemporaneous presence of smoke, made it reasonable "for the officer to infer that the smell and smoke were related and together more likely than not indicated a criminal transaction").

¶ 81. In short, our caselaw has made it clear that an odor of marijuana is a factor, but not necessarily a determinative factor, as to whether probable cause exists. See Guzman, 2008 VT 116, ¶¶ 13-14 (agreeing with courts that treat odor of marijuana as factor in totality-of-circumstances test rather than those courts concluding that odor of marijuana alone can provide probable cause to believe that marijuana is nearby).[22] The weight of that factor in determining

---

[22] In Guzman, we quoted a Massachusetts court for the proposition that most other courts considering the question of when the odor of marijuana is sufficient to support probable cause "agree that 'the odor of marijuana is sufficiently distinctive that it alone can supply probable cause to believe that marijuana is nearby.' " Guzman, 2008 VT 116, ¶ 13 (quoting Commonwealth v. Garden, 883 N.E.2d 905, 910 (Mass. 2008)). But see Commonwealth v. Rodriguez, 37 N.E.3d 611, 618 (Mass. 2015) ("Garden's conclusion that the odor of marijuana alone creates probable cause to believe that the drug is still present is insufficiently nuanced, because it fails to account for the significant possibility that the odor of burnt marijuana may be present on a person or in a vehicle, but the drug itself is not."). In fact, many, if not most, courts concluding that the odor of marijuana created probable cause to support a search have also relied on other accompanying factors, such as the suspect's extreme nervousness or admissions or other visible signs of marijuana use or possession, to support their probable cause determination. See, e.g., People v. Waxler, 224 Cal. App. 4th 712, 725 (Cal. Ct. App. 2014) (holding that "a law enforcement officer may search a vehicle pursuant to the automobile exception to the warrant requirement where the officer smells burnt marijuana and sees burnt marijuana in the defendant's car"); Brown v. State, 715 S.E.2d 802, 805 (Ga. Ct. App. 2011) (concluding that smell of marijuana in car, in addition to flakes of marijuana on floorboards of car and suspect's visible agitation, gave officer probable cause to believe vehicle contained contraband); see also A. Levinson Ben-Yosef, Annotation, Validity of

whether probable cause exists generally depends not only the nature and strength of the odor and other factors accompanying the odor, but also how those factors relate to the offense being investigated. While adjectives assessing the strength of an odor may be subjective and unhelpful at times in assessing whether probable cause exists, see Commissioner v. Overmyer, 11 N.E.3d 1054, 1059 (Mass. 2014) (stating that "characterizations of odors as strong or weak are inherently subjective"), the faint smell of burnt marijuana is far less probative as to whether a car contains marijuana than, say, an overpowering odor of fresh marijuana emanating from the trunk of a car.

¶ 82.    Given the circumstances of this case and considering our relevant caselaw examined above, we conclude that Officer Hatch's seizure of plaintiff's vehicle violated plaintiff's rights under Article 11. The seizure, aimed at immobilizing plaintiff's vehicle while the officer sought a search warrant, was essentially based solely on the trooper's initial detection of the faint odor of burnt marijuana, which did not, in and of itself, create a fair probability that marijuana would be found in the vehicle. The other factors posited by the State—the presence of an air freshener and a bottle of Visine, in addition to plaintiff's statement that he had smoked marijuana in the past few days—did not add any probative evidence to establish probable cause to support the seizure.

¶ 83.    In its March 2015 order dismissing plaintiff's count alleging that the information supplied by Trooper Hatch did not support the search warrant, the superior court concluded that the probable existence of any amount of marijuana supported the issuance of a warrant to search for contraband. Plaintiff briefly argues on appeal that the court failed to consider whether issuance of the search warrant was unreasonable under the circumstances of this case and that, even if a

---

Warrantless Search of Motor Vehicle Based on Odor of Marijuana—State Cases, 114 A.L.R.5th 173 (2003) (collecting cases in which courts found or did not find probable cause for warrantless searches based on odor of marijuana and other factors); E. Lauzon, Annotation, Odor Detectable by Unaided Person as Furnishing Probable Cause for Search Warrant, 106 A.L.R.5th 397 (2003) (collecting cases in which courts found or did not find probable cause to support issuance of search warrant).

warrant could be issued for a suspected civil violation, the search could not stand because the preceding seizures were illegal. The critical difference between the seizure of plaintiff's vehicle and the issuance of the search warrant was Officer Hatch's statement in his warrant application, in addition to the other bases he alleged for seeking the warrant, that a dog certified to detect the presence of narcotics, including marijuana, had alerted twice on the trunk of plaintiff's vehicle at the police barracks. This unchallenged statement, in addition to the other indicia of drug use discussed above, established probable cause to issue the warrant. Accordingly, the issuance of the warrant does not constitute a basis for damages pursuant to plaintiff's lawsuit.

## V. Summary

¶ 84. In sum, we conclude that a direct private right of action for damages based on alleged flagrant violations of Article 11 is available against the State. The common law doctrine of sovereign immunity does not preclude such an action, even though the VTCA is not applicable. A plaintiff must show either a violation of clearly established law, which the actor knew or should have known he or she was violating, or bad faith, which may take the form of discriminatory animus. In this particular case, we conclude that the stop and seizure of plaintiff's car constituted violations of Article 11. Accordingly, we reverse the superior court's summary judgment ruling in favor of the State. Because the parties heretofore have not had the opportunity to address the elements of a direct action under Article 11 as established in this opinion, we remand the matter to give them an opportunity to file renewed motions for summary judgment, if they so choose. We make no pronouncement at this juncture as to whether the facts of this case are sufficient or insufficient to survive a renewed motion for summary judgment.[23]

---

[23] The State notes in its brief that plaintiff did not make an equal protection claim or allege racial discrimination in its complaint. Although plaintiff has consistently suggested throughout these proceedings that Trooper Hatch's stated reasons for his actions were driven by implicit discriminatory bias, he has made no equal protection claim under the Common Benefits Clause and cannot do so on remand. He may, however, in the context of his Article 11 claim, seek to

50

The superior court's dismissal of plaintiff's count 4 in its March 10, 2015 decision and its grant of summary judgment to the State in its May 10, 2017 decision are reversed; the matter is remanded for further proceedings consistent with this opinion.

FOR THE COURT:

_____

Associate Justice

---

demonstrate that he can produce evidence in which a factfinder could find bad faith in the form of discriminatory bias, which is one of the elements established in this opinion for such a claim.